**FULFOAM CORPORATION, Plaintiff,**

**v.**

**KROEHLER MANUFACTURING COMPANY OF NORTH CAROLINA, Inc., Defendant.**

**Civ. No. 1510.**

United States District Court
W. D. North Carolina,
Charlotte Division.

Aug. 12, 1963.

McNeill Smith, Smith, Moore, Smith, Schell & Hunter and David Rabin, Greensboro, N. C., for plaintiff.

Dugald S. McDougall, Ooms, Mc-Dougall & Hersh and Nathan N. Kraus, Kahn, Adsit & Arnstein, Chicago, Ill., and Ray Rankin, Charlotte, N. C., for defendant.

CRAVEN, Chief Judge.

The validity or invalidity of plaintiff's patent No. 2,913,041 is the only ultimate question to be decided by the court in this action.

Contemporaneously with the filing of this opinion, the court has filed detailed findings of fact and conclusions of law. Only sufficient facts to permit an understanding of the controversy will be recited in this opinion.

Plaintiff, Fulfoam Corporation, is a North Carolina corporation and is the owner of the entire right, title and interest in patent No. 2,913,041 by assignment from Crest Furniture Corporation on a patent application filed by Robert V. Mathison. The application on which the patent in suit was granted on November 17, 1959, was filed on March 26, 1957, for an invention relating to the method of constructing upholstered furniture.

The defendant, Kroehler Manufacturing Company of North Carolina, is a North Carolina corporation and a wholly-owned subsidiary of Kroehler Manufacturing Company of Illinois. The defendant concedes that it has used the method described in the patent claims in suit, but pleads that those claims are invalid.

Patent No. 2,913,041 entitled "Upholstered Furniture and Method of Constructing" relates to a method of constructing furniture upon an open frame in which there is a back and a seat, the foundation of which is formed by spring members. A prefabricated sub-assembly is formed by cutting a flat sheet of urethane foam to a predetermined size and shape forming a padding or backing for ˙the fabric to be applied thereover. A covering fabric is cut to a predetermined size and shape for application to the pre-

cut flat sheet of urethane foam. The flat sheet of urethane foam and the covering material are secured together at selectively spaced positions so as to compress the urethane foam thereby presenting a contoured facial configuration or sculptured appearance on the fabric side through depressions produced by securing the urethane foam and the cover material together. The prefabricated subassembly is draped over the open frame and secured by suitable means attaching or anchoring it thereto. It is important to note that all of the claims embody the use of urethane foam. Indeed, counsel for plaintiff in oral argument agrees that the use of the same method with a material other than urethane foam would *not* be an infringement.

The premise of the patent is that in the prior art the back padding and the outer back cover were attached to the frame in *separate* steps requiring great manual skill on the part of the upholsterer. It is claimed that Mathison's method avoids this previously difficult procedure by cutting the cover fabric and its underlying padding to the appropriate size and joining them together as a sub-assembly which can then be spread over the springs and tacked to the frame by relatively unskilled labor. Although it is conceded by defendant, and found by the court, that this representation was made in good faith, it appears to be largely a false premise. Sub-assemblies comprising a sheet of cover fabric and a sheet of padding, stitched together along spaced seams in the Mathison manner, were actually old in the upholstery art years before the patent in suit. They were referred to in the industry as "upholstery blanks" and were used in the prior art just as Mathison used them. The padding material disclosed in the prior art references of record was cotton padding or latex foam rubber sandwiched between the cover fabric and the backing cloth of a material such as muslin. The old "sandwiches" did not work as well as the new ones for the simple and only reason that urethane foam makes a better pad. Both "open" and "closed" sandwiches are within the claims of the patent. Plaintiff's "open-face" method is merely a tribute to the inherent characteristics of urethane foam, which, as stated in Upholstering for November 1955, has a high tear resistance and because of its inherent strength can be sewn * * * and used as an outer cover material without backing or binding.

Sooner than most, Mathison realized urethane foam was not an equivalent of foam rubber, but instead possessed different properties which made it "better" for some furniture purposes and "worse" for others. It was not as good as foam rubber for the purpose of cushioning, but was better than foam rubber for "padding" use, mostly because it could be sewn and compressed by thread tension without tearing. These different properties, however, were not discovered by Mathison. Such properties had been described to the industry as early as November 1955 in Upholstering.

If Mathison taught the industry anything—and it is not found that he did—it was simply to substitute urethane foam for cotton or foam rubber padding in the same old prior art method.

■ Where the subject matter of a patent claim is not identically disclosed in a single prior art publication (as here), determination of whether or not it is patentable over the prior art is governed by Title 35 U.S.C.A. § 103, which reads in pertinent part as follows:

"A patent may not be obtained * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

■ Application of this statute to the facts calls for objective analysis rather than subjective speculation aided by hindsight. Honolulu Oil Corp. v. Shelby Poultry Co., 293 F.2d 127, 131, 132 (4th Cir. 1961).

Three times the Examiner denied the patent application, correctly ruling that mere substitution of materials was not patentable. He allowed the patent only because he was talked into believing, erroneously, that Mathison's sub-assembly construction, *per se*, was new. But Walker 2,174,711 and Weiss 2,568,527 taught stitching through the padding in spaced seams with compression of it and attachment of the upholstery blank to the frame and would thus fully anticipate the claims in suit but for the claims' recitation of urethane foam as the padding material.

■ By statute, 35 U.S.C.A. § 282, a patent issued by the Patent Office is presumed valid, and the burden of establishing invalidity is on the party asserting it. This presumption, however, is weakened by the fact that the prior art references referred to in this opinion were not cited by the Examiner and, in the opinion of the court, are more pertinent than Mantegna 2,775,287 and others which were before the Examiner.

■ Ordinarily, the substitution of new materials for older materials and the application of old skills to the new material is not invention. Especially is this true where the patentee, as here, was not the first to recognize the special properties of the new material in the art to which his "invention" pertained. B. F. Goodrich Co. v. United States Rubber Co., 244 F.2d 468, 469 (4th Cir. 1957).

■ Defendants have proved invalidity by clear and convincing evidence. They are not required to do so beyond a reasonable doubt. Universal, Incorporated v. Kay Manufacturing Corp., 301 F.2d 140 (4th Cir. 1962).

### ANTICIPATION

■ Assuming that the Mathison patent constituted invention, it was anticipated and falls under the prohibition contained in 35 U.S.C.A. § 102 because the invention was * * * in public use or on sale in this country for more than one year prior to the date of application for Mathison's patent in the United States Patent Office.

Beyond question, and indeed beyond reasonable doubt, the evidence establishes that B. & W. Upholstering, Inc. of High Point, North Carolina, used the method which Mathison later tried to patent in making a sofa bed before the end of 1955 and publicly exhibited the bed in January of 1956. Mathison's first use of the process did not take place until late February of 1956, and his first public exhibition was in June of 1956, so that B. & W.'s public use not only antedated by more than a year the filing date of Mathison's patent application (March 26, 1957), but actually was earlier than Mathison's first use of the method.

■ Documentary evidence, fully set forth in the court's findings of fact, amply supports and corroborates oral testimony which shows unquestionably that at least two sofa beds were manufactured during February 1956 using the method Mathison subsequently attempted to patent. That other sofa beds were made by B. & W. in a different method tends only to impeach the oral testimony and would perhaps be sufficient but for the plenary documentary evidence. To invalidate plaintiff's patent, it is sufficient that one sofa bed was commercially manufactured by the claim method more than a year before Mathison's filing date. It does not matter that others were made in a different method and manner. Maibohm v. RCA Victor Co., 89 F.2d 317, 320–321 (4th Cir. 1937).

Application of the actual language of the claims in suit to the evidence of B. & W. production shows very clearly that the method by which B. & W. made its sofa beds in 1955–56 was the very method that Mathison subsequently attempted to patent:

(a) B. & W. used, as "padding for the back", a "flat sheet of urethane foam", cut to "appropriate size and shape".

(b) A sheet of "flat cover material" was cut to "appropriate size and shape to finish the back".

(c) The padding and cover were stitched together "at spaced posi-

598

tions", "compressing the urethane foam to form a contoured predetermined design" in the outer surface of the upholstery blank, leaving the foam sheet and cover material "free for relative movement intermediate the positions of attachment".

(d) The process was completed, in B. & W.'s operation, by "shaping and attaching the sub-assembly to the frame".

B. & W.'s process was a literal anticipation of plaintiff's claims 1 through 3 in suit. Since claim 4 calls for "tufting" the foam and cover sheet together rather than stitching them, B. & W.'s method was not literally identical to the procedure recited in claim 4. But tufting and stitching are both conventional techniques in the upholstery art for joining things together, and they are noted in Mathison's specification as mere interchangeable equivalents. Reversing the doctrine of equivalents, therefore, destroys claim 4 also. American Fruit Growers, Inc. v. Brogdex Co., 283 U.S. 1, 14, 51 S.Ct. 328, 75 L.Ed. 801 (1931); Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973 (1945).

Plaintiff strenuously insists, however, that B. & W.'s operations were not "public" in the legal sense. In support of such contention, the plaintiff makes much of the fact that not even an expert can look at the exterior of a sofa or piece of upholstered furniture and determine the method of interior construction.

During 1955–56, B. & W. customers and prospective customers frequently visited its factory to observe the manufacture of furniture, such visits occurring every day. Employees leaving B. & W. employment, and there was normal labor turn-over, were never pledged to secrecy with respect to their knowledge of B. & W.'s methods of operation. In January 1956, B. & W. salesmen explained the construction of B. & W.'s sofa to retail dealers at the High Point furniture market, and even exhibited to such retailers small sample sub-assemblies of cover fabric sewn to urethane foam padding to illustrate the method of construction used in the actual sofa bed and its relative strength and resistance to tearing as compared with foam rubber.

Unquestionably the so-called Mathison invention was in public use and on public sale in this country more than one year prior to the date of the application for the Mathison patent. 35 U.S.C.A. § 102 requires a judgment that plaintiff's claims in suit are void by reason of anticipation.

Counsel may submit an appropriate judgment.